IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
August 19, 2021 Session

## PAUL ZACHARY MOSS v. SHELBY COUNTY CIVIL SERVICE MERIT BOARD

**Appeal from the Chancery Court for Shelby County
No. CH-15-1669     JoeDae L. Jenkins, Chancellor**

_____

**No. W2017-01813-COA-R3-CV**

_____

This appeal arises from a petition for judicial review of a decision of the Shelby County Civil Service Merit Board. The appellant was a firefighter and paramedic and was terminated from his employment after he was involved in a physical altercation at a political rally. After a hearing, the Board upheld his termination. The appellant then sought judicial review in chancery court. After reviewing the administrative record, the chancery court likewise upheld termination. On appeal, this Court concluded that the decision upholding the appellant's termination should be reversed due to a violation of his due process rights. The Tennessee Supreme Court found no due process violation and reversed the decision of this Court, remanding for consideration of alternative arguments raised by the appellant that were deemed pretermitted in our previous opinion. Having carefully considered the appellant's alternative arguments, we affirm the chancery court's rulings on some issues but ultimately must vacate in part the decision upholding termination and remand for further proceedings before the Board.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed
in Part, Vacated in Part, and Remanded**

CARMA DENNIS MCGEE, J., delivered the opinion of the court, in which ARNOLD B. GOLDIN and KENNY W. ARMSTRONG, JJ., joined.

Andrew C. Clarke, Memphis, Tennessee, and Eric H. Espey, Germantown, Tennessee, for the appellant, Paul Zachary Moss.

Megan J. Smith, E. Lee Whitwell, and John B. Turner, Jr., Memphis, Tennessee, for the appellee, Shelby County Civil Service Merit Board.

# OPINION

## I. FACTS & PROCEDURAL HISTORY

Paul Zachary Moss began working as a paramedic in 1999, and he became a firefighter in 2002. In 2007, he began his employment with the Shelby County Fire Department as a firefighter and paramedic. He was terminated after an incident that occurred on November 1, 2013. Moss was off-duty and at home when he received a telephone call from his wife, who was at a political rally in Memphis at which participants were expressing opposition to President Barack Obama. Moss's wife stated that she was feeling threatened and asked him to come to the rally. When Moss arrived, he approached a woman who was visibly angry with the protestors and learned she was upset that someone was wearing a Halloween mask depicting President Obama. The police arrived around this time, and the woman went to speak with the police. Someone else mentioned to Moss that there was some concern about the possibility of a drive-by shooting. By this time, however, the protestors had already left the area of the protest and returned to their vehicles in a nearby parking lot. Moss went to the parking lot and asked who had been wearing the mask. Mason Ezzell informed Moss that he was the one who had worn the mask. Moss suggested that the use of the mask could be seen as racist. Moss admittedly "got upset" and "started yelling at him." He asked Mr. Ezzell, "Are you stupid?" According to Moss, Mr. Ezzell did not seem to care and "just brushed [him] off." As Mr. Ezzell was walking away, Moss admittedly followed after him, insisting that he "would be heard." At that point, Mr. Ezzell's friend, Earl Mayfield, Jr., grabbed Moss from behind and pulled him to the ground in a headlock.[1] According to Mr. Mayfield, he grabbed Moss as he "lunged" at Mr. Ezzell. While Mr. Mayfield was trying to hold Moss, Mr. Ezzell grabbed Moss's arms. Moss then pulled out a handgun and pointed it at the men, and the altercation ended.

The police were already on the scene and confiscated Moss's weapon. Moss was handcuffed and transported to the police station. That evening, Mr. Ezzell and Mr. Mayfield signed documents declining to prosecute. After Moss was released, he notified his battalion chief about the incident. Days later, however, Mr. Ezzell and Mr. Mayfield changed their minds about prosecution. Moss was ultimately charged with two counts of aggravated assault. On February 24, 2015, the Shelby County Criminal Court accepted Moss's *Alford* guilty plea to one count of aggravated assault arising out of the altercation involving Mr. Ezzell and dismissed the count involving Mr. Mayfield. The criminal court placed Moss on judicial diversion.[2]

---

[1] Moss was age 38 at the time of the incident, Mr. Ezzell was 69, and Mr. Mayfield was 68.

[2] As our supreme court explained in its opinion in this matter, "In an *Alford* or best interest plea, a defendant enters a guilty plea and concedes that the prosecutor's evidence would likely result in a guilty verdict but the defendant does not admit to committing the criminal act." *Moss v. Shelby Cty. Civ. Serv. Merit Bd.*, 597 S.W.3d 823, 824 n.1 (Tenn. 2020) (citing *North Carolina v. Alford*, 400 U.S. 25, 37

On March 2, 2015, the Shelby County Fire Department provided Moss with a "*Loudermill* Notice" of proposed major discipline for violating departmental policies.[3] Specifically, the notice provided the following description of two policies:

> I: RR-0164005: General Rules of Conduct; Page 1, Line 5 (E) states: Disciplinary Action, including discharge, may be taken for, but shall not be limited to the following causes: (e) That the employee has been convicted of a felony.
>
> II. AD-0807001: Notification of Arrest; Page 1 (last two sentences state): Disciplinary action may be taken against an employee, as a result of evidence presented, that is in violation of Shelby County Policies, procedures or regulations. Such disciplinary action may be separate and apart from pending or final court decisions.

The notice informed Moss that disciplinary action up to and including termination was being considered. Moss was invited to meet with Deputy Chief Dale Burress on March 30 to present any reasons why the proposed disciplinary action should not be taken.

Moss met with Deputy Chief Burress and Fire Chief Alvin Benson on March 30 in what is known as a *Loudermill* hearing. Moss acknowledged that he went to the political rally in order to escort his wife away from the scene because she felt threatened. He admitted that he was armed but denied that he had been drinking. Moss stated that the man who had been wearing the mask was the one who initially confronted him. However, Moss conceded that the man stated, "I don't have to stand here and listen to this," and that Moss replied, "Then you can hear me." Moss said he "attempted" to follow the man and was tackled. He conceded that a physical altercation ensued and that he pointed his weapon at the men. Moss said he was later arrested and charged with aggravated assault but that he was not "found guilty." Moss was then asked, "Have you had other instances (arrest or not) involving alcohol, weapons and/or assault requiring police involvement?" He initially indicated that he had no other police involvement but then said he had been arrested for possession of a weapon but that the charges were

---

(1970)). It also explained, regarding judicial diversion, "If a qualified defendant complies with all of the conditions of diversion, including completing the required probationary period without violating a condition of probation, the trial court will dismiss the diverted charges. The defendant can then request that the charges be expunged from the public record." *Id.* at 824 n.2 (citing Tenn. Code Ann. § 40-35-313 (2014)).

[3] "In *Cleveland Board of Education v. Loudermill*, 470 U.S. 532 [] (1985), the United States Supreme Court held that public employees, who may be fired only for cause, have a right to notice and an opportunity to respond to charges against them. Under the Shelby County Civil Service Merit Act of 1971, Mr. Moss was a classified Shelby County employee and could be terminated only for just cause." *Moss*, 597 S.W.3d at 824 n.3 (citing 1971 Tenn. Priv. Acts, ch. 110).

dropped.  He said there was no alcohol involved.  He denied having any charges involving an assault on a female.

The next day, on March 31, 2015, Moss was notified by letter from Chief Benson of the termination of his employment.  The three-page letter began with a paragraph describing the events that occurred at the political rally.  It described Moss's admission that he called a man "stupid" and suggested that his actions could be considered racist, and when the man turned and walked away, Moss followed him insisting that he "be heard."  The termination letter noted witness statements that Moss "lunged at the man, tearing his shirt," at which point he was taken to the ground by a second man who was trying to protect the first man.  The termination letter noted that Moss pulled his weapon and pointed it at the men, threatening to kill them both.  It noted that Moss was handcuffed and taken to the police station and that he eventually entered a guilty plea to aggravated assault.  Next, the letter restated the two charges quoted above from his *Loudermill* notice and described the *Loudermill* hearing.  The letter stated that Moss's answers to questions during the *Loudermill* hearing were deemed "vague and in some cases deceptive and/or untrue."  The letter stated that Moss denied he had been drinking although he had told Chief Burress otherwise, and eyewitnesses had stated that Moss appeared to be under the influence and "out of control."  The termination letter noted Moss's claim that he went to the rally to escort his wife from the scene, but instead, he "confronted protestors," engaged in a fight, and then attempted to leave without his wife.  It stated that Moss's actions reflected "extreme aggression and hot-temperedness" and that his disposition was "confrontational."  It stated that Mr. Ezzell "was apparently trying to de-escalate the situation" but that Moss followed him, lunged at him, and ripped his shirt.  The letter acknowledged Moss's *Alford* plea but said "it does not exonerate you administratively."

The termination letter also stated that Moss was not completely honest when asked about other instances involving "alcohol, weapons, and/or assaults."  Although he admitted one prior arrest for possession of a weapon without a permit, he denied that alcohol was involved despite a police report to the contrary.  Police records showed that Moss was charged by the Bartlett Police Department with Possession of a Firearm While Under the Influence in connection with the 2011 incident.  The letter stated that Moss failed to notify the department of his arrest as required by policy.  The letter also stated that Moss denied an October 1, 2012 incident when the police responded to a complaint that Moss had allegedly assaulted his wife.

In summary, the termination letter stated that the evidence against Moss was "overwhelming."  Chief Benson wrote,

> I am thoroughly convinced that you were the primary aggressor in this case and welcomed any encounter you would face.  You had been drinking, had a firearm and were emboldened.  You were looking for

trouble and ensured it by picking a fight. Your behavior was irresponsible, careless and reckless. You not only jeopardized the lives of two aging decorated military veterans, but the lives of everyone at the scene. Instead of taking responsibility for your actions, you suggested (without basis), that the men used politics and campaign donations to influence Attorney General Amy Weirich in this case. To make matters worse, you were consistently dishonest during the hearing. You have brought dishonor to the Shelby County Fire Department.

Considering the elements of this case and the preponderance of evidence, it is my decision that you are hereby terminated from employment for violating the standards of personal conduct and behavior of Shelby County Fire Department employees, effective March 31, 2015. . . .

Moss appealed his termination to the Shelby County Civil Service Merit Board.

The Board hearing was held on October 20, 2015. At the outset of the hearing, counsel for Moss informed the Board "for the record" that he had subpoenaed a witness who was not in attendance. Shelby County's attorney confirmed that Mr. Ezzell was not in attendance because he had a longstanding trip planned with his wife, but he said that Mr. Ezzell's written statement was included in the record from the *Loudermill* hearing and that Mr. Mayfield was present to testify in person. Moss's attorney referenced his due process right to confront witnesses and asked that all charges against him be dismissed due to Mr. Ezzell's absence. The Board Chairman stated that the Board lacked the power to do that and said "at the most, we can continue." Moss's attorney stated, "We are not asking for a continuance. We want to proceed forward." He said the hearing had already been continued "a number of times" and that after discussing the issue with opposing counsel, they determined "we just had to go forward." The Chairman then indicated that the Board was going to proceed with the hearing.

During his opening statements, counsel for Shelby County argued that Moss was terminated because he instigated a fight and pointed a gun in a crowd when he had been drinking, he had a "history" of incidents showing behavior unbecoming of a firefighter, and he was untruthful. Moss's attorney objected, insisting that the case was only about "two charges" – conviction of a felony and failure to notify supervisors of the most recent arrest – as described in the original *Loudermill* notice.

Shelby County presented testimony from Mr. Mayfield, Chief Benson, and Chief Burress. Moss presented testimony from his criminal defense attorney and also testified himself. Numerous exhibits were also submitted to the Board, including the fire department's file regarding Moss.

Mr. Mayfield testified that he and his friend, Mr. Ezzell, had attended the November 1 political rally together and that Mr. Ezzell wore a mask that was left over

from Halloween (the day before). He said after the rally they walked to their cars to put their materials away, then they saw Moss walking toward them yelling that they were stupid and racists and demanding to know who was wearing the mask. He said when Mr. Ezzell admitted that he had worn the mask, Moss approached him and continued yelling the same things and saying that they had endangered his wife. Mr. Mayfield described Moss as "enraged" and said it was "obvious" to him that Moss was under the influence of either alcohol or drugs. He said Mr. Ezzell listened to Moss for a few minutes or seconds then said he was not going to listen to Moss anymore. Mr. Mayfield testified that Moss continued yelling and "lunged" or "jump[ed] towards" Mr. Ezzell. Mr. Mayfield said he grabbed Moss from behind as he passed in front of him and pulled Moss to the ground right as Moss tore Mr. Ezzell's shirt. Mr. Mayfield said he never struck Moss and was merely attempting to hold Moss to keep him from attacking anyone. He said Moss was much younger and stronger, and as Moss "began to get loose" he pulled his gun and threatened to kill him. Mr. Mayfield testified that he let go of Moss, and the altercation ended. Mr. Mayfield acknowledged that he had also been armed with a weapon but said that he never pulled his gun during the struggle.

Fire Chief Alvin Benson testified about his participation in the pre-termination *Loudermill* hearing and the decision to terminate Moss. Chief Benson said he concluded that Moss was the primary aggressor in the altercation, that he had used a weapon, and there was "every reason to believe" that Moss was under the influence of alcohol at the time. Chief Benson said the department also looks at prior instances of similar behavior to assess the individual's credibility regarding present charges. He testified that during the investigation of this incident, he discovered that Moss had two prior instances of police contact and/or arrests, with one involving an assault and another involving alcohol and a weapon. Specifically, he said police records showed that Moss had been arrested in Bartlett and charged with public intoxication and possession of a firearm while under the influence, and the second incident involved a report taken by the Shelby County Sheriff's Department in which Moss's wife reported a domestic assault. Chief Benson testified that he could not find any record of either incident being reported to Moss's supervisors. Chief Benson denied that he had personally attended a meeting about Moss's prior arrest and said that Moss's prior incidents occurred before he was employed with Shelby County.

Chief Benson testified that after deciding if an employee has done what was alleged, he must decide "what is the appropriate remedy." He said that progressive discipline is usually required but not always acceptable. Chief Benson testified that termination on the first disciplinary offense was deemed appropriate in Moss's case because, again, he was the primary aggressor, he used a weapon needlessly, and he was under the influence. Chief Benson testified as to his belief that termination should be upheld in this case. He explained, "[I]f a firefighter is going to be under the influence, if they are going to have a weapon and use that weapon on a citizen, I am going to terminate that person. I have done it in the past." When asked if he uniformly handles

instances similar to this one, Chief Benson reiterated,

> A.   It's very simple. One of our rules is if there is a domestic incident and the employee is the primary aggressor, and if there is a weapon involved, that is a termination.  It is a terminating offense.
> Domestic violence, primary aggressor, weapon involved of any type, termination.  That is my history. That is the policy.
> Q.   And the employees understand that?
> A.   The employees understand that.

Cross examination began immediately after this exchange.  Counsel for Moss asked Chief Benson if his three-factor termination policy would apply to Moss when the incident at the rally was not a domestic assault.  Chief Benson then clarified that his rule applies to violence or assaults generally, not just domestic.  Counsel for Moss asked if the same policy would be applied to someone who commits sexual battery.  Shelby County's attorney objected on the basis of speculation and said the issue before the Board was limited to Moss's history.  Counsel for Moss stated that he was attempting to question Chief Benson about his claim that he uniformly enforces his three-factor termination policy.  Chief Benson then answered the question by stating that a firefighter who committed sexual battery would likely be terminated.  Moss's attorney then asked why Chief Benson had not terminated a firefighter named Andre Gaston.  At that point, the Board Chairman stated, "That is not admissible.  That is not admissible to this hearing, whoever it is."  Counsel for Shelby County also objected, stating that Moss was the focus of the hearing, not Mr. Gaston.  He insisted that the proffered evidence was irrelevant.  Moss's attorney explained that he was attempting to impeach Chief Benson's statement on direct that he uniformly enforces his termination policy.  Still, the Chairman stated that he was sustaining the objection of Shelby County.  Moss's counsel asked to make an offer of proof, but the Chairman expressed his opinion that the proper time for doing so would be on appeal.  He reiterated that he had sustained the objection of Shelby County.

Chief Benson went on to testify about Moss's conduct in relation to the two charges in the *Loudermill* notice.  He admitted that Moss did notify his supervisor of his arrest after the political rally.  He also acknowledged that there was no conviction of a felony due to Moss being placed on judicial diversion, but, he added, "he was guilty administratively, as far as the Fire Chief was concerned."  In a nutshell, he described Moss's offense as "point[ing] a gun at a citizen."  He also said the incident at the rally "opened up a can of worms for Mr. Moss" because it led to the discovery of his other incidents involving police.  Chief Benson said when he asked Moss during the *Loudermill* hearing about "other instances (arrest or not) involving alcohol, weapons and/or assault requiring police involvement," Moss initially said he had none when "we ha[d] documents to prove otherwise."  Considering everything that Moss had done, Chief Benson did not believe that Moss could continue to work for the department.

Deputy Chief Dale Burress also testified. He had conducted most of the investigation in Moss's case and also participated in his *Loudermill* hearing. He likewise believed that someone who had pled guilty to a felony for aggravated assault could not remain a firefighter under county policies. Chief Burress also believed that Moss's answers during the *Loudermill* hearing were untruthful. Chief Burress acknowledged that Moss had no prior disciplinary history aside from a few issues with attendance. However, he testified that Moss's termination was consistent with the discipline imposed on other county employees in other instances.

Moss's criminal defense attorney, Kenneth Brashier, testified as to the effect of Moss being placed on judicial diversion. He explained that when a guilty plea is entered under the judicial diversion statute in Tennessee, there is no conviction. Mr. Brashier had written a letter to the Deputy Chief with this information and provided it to Moss to submit during the *Loudermill* hearing.

The final witness was Moss. He denied that he was drinking on the date of the political rally. He admitted to approaching the protestors in the parking lot and getting "upset" and yelling at Mr. Ezzell. He admitted that Mr. Ezzell "brushed [him] off" and was walking away and yet he continued after him "trying to be heard." However, Moss denied grabbing or swinging at Mr. Ezzell and said Mr. Mayfield was the one who grabbed him. He claimed that he pulled his gun because he was afraid the two men were going to kill him.

Moss acknowledged he had been arrested in Bartlett in 2011, but he claimed that the incident did not involve alcohol. Moss claimed that he had been under the influence of prescribed pain medication and was "sleep-walking, essentially," when he was arrested, and once he explained the situation, the charges against him were dismissed. Moss testified that he had reported the 2011 arrest and had a meeting with various supervisors about the incident, including Chief Benson (although Chief Benson denied attending such a meeting or working for Shelby County during that timeframe). Moss had no written documentation of his report to supervisors or of the meeting. Regarding the second incident, with his wife, Moss testified that he was not at his residence when the police arrived and was not aware that a report had been taken.

Moss suggested he did not intentionally answer untruthfully when asked about his police involvement during the *Loudermill* hearing. He said he understood the question to be whether he had been involved in any other instances involving alcohol, weapons, *and* assault, with all three of these factors combined in one incident. Moss said that he had specifically asked for clarification about whether the question was "inclusive," meaning "those three things together," and that is why he answered no.

On November 20, 2015, the Board issued an eight-page written decision unanimously upholding Moss's termination. The Board found that the department had

met its burden of proof of showing "cause" for Moss's termination. The Board found that Moss was untruthful in the *Loudermill* hearing and that he "exhibited conduct unbecoming of a Shelby County Firefighter or Shelby County employee while off duty." It concluded, "Regardless of whether Mr. Moss received a Judicial Diversion relating to the incident of November 1, 2013 in which he pulled a weapon on two elderly men, the fact is that the incident occurred and is an egregious violation of the General Rules of Conduct. Mr. Moss'[s] outrageous conduct reflected adversely on all firefighters."

Moss filed a petition in chancery court seeking review of the Board's decision. He argued that his procedural due process rights were violated by the *Loudermill* hearing process because he was not provided with adequate notice of the charges against him, as the Board upheld termination based on reasons that were not listed in the *Loudermill* notice. He also argued that the Board violated his procedural due process rights in several other ways: (1) by proceeding in the absence of Mr. Ezzell, who was subpoenaed but failed to appear at the hearing; (2) by limiting counsel in his cross-examination of Chief Benson regarding his enforcement of policies against other firefighters; and (3) because the Board failed to direct Mr. Mayfield to answer questions when he became sarcastic and unresponsive and a Board member laughed at his testimony. Finally, Moss argued that the Board's decision was arbitrary and capricious and unsupported by substantial and material evidence. Moss noted the testimony that he was not convicted of a felony and that he had provided notice of his arrest after the rally.

On August 10, 2017, the chancery court entered an order upholding Moss's termination. The chancery court concluded that the pre-termination and post-termination proceedings, when viewed as a whole, provided Moss with sufficient notice of the charges against him. Next, the court found that Moss waived any issue regarding his inability to confront Mr. Ezzell when he failed to seek a continuance or take his deposition. Regarding cross-examination of Chief Benson, the chancery court found that the Board permissibly limited Moss's counsel in the scope of his cross-examination by applying "the same process found in Rule 611(c)(2) of the Tennessee Rules of Evidence." Alternatively, the chancery court found that the inquiry by counsel did not appear to be relevant and that any error regarding this issue was harmless. Next, the chancery court found that Moss had failed to show any prejudice from the fact that a witness's answer had elicited laughter from a Board member. Finally, the court found that substantial and material evidence supported the Board's decision that Moss violated county policy and that termination was justified.

Moss timely filed an appeal to this Court. On appeal, Moss continued to assert that reversal was required due to the various arguments he presented in chancery court. *Moss v. Shelby Cty. Civ. Serv. Merit Bd.*, No. W2017-01813-COA-R3-CV, 2018 WL 4913829, at *3 (Tenn. Ct. App. Oct. 10, 2018) *rev'd* 597 S.W.3d 823 (Tenn. 2020). However, this Court found one issue dispositive: whether "his due process rights were violated because he was not given proper notice of the charges against him." *Id.* We

noted that the *Loudermill* notice apprised Moss of only two charges – conviction of a felony and failure to provide notification of his arrest – and neither of these two charges was established regarding the 2013 incident. *Id.* Instead, the Board's position appeared to be that "irrespective of a conviction, Mr. Moss's termination was justified on account of what occurred at the 2013 incident and other alleged bad acts that were uncovered in the Fire Department's investigation of it." *Id.* We recognized that the Board "did not ultimately uphold Mr. Moss's termination on account of the specific charges that had been brought against him" but instead referred generally to his untruthfulness and conduct "unbecoming" of a Shelby County employee. *Id.* However, we found that the record was "devoid of clarity that other charges . . . were ever specifically pursued against him with accompanying fair notice." *Id.* at *4. Ultimately, we concluded that "[t]o the extent that the Board upheld Mr. Moss's termination on grounds other than the charges specifically identified, the termination ran afoul of Mr. Moss's due process rights, and therefore, the Board's decision should be reversed." *Id.* at *5. All other issues were deemed pretermitted. *Id.*

The Tennessee Supreme Court granted the Board's application for permission to appeal and reversed the decision of this Court. *Moss v. Shelby Cty. Civ. Serv. Merit Bd.*, 597 S.W.3d 823, 830, 834 (Tenn. 2020). The supreme court held that the department provided Moss "with sufficient notice to satisfy the requirements of due process." *Id.* at 824. The supreme court framed the issue as "whether Mr. Moss received adequate notice from the pre-termination and post-termination procedures of the grounds on which the Board upheld the Fire Department's decision to terminate his employment." *Id.* at 831. The court concluded that he did. The supreme court stated that Moss placed undue emphasis on the *Loudermill* notice. *Id.* at 832. It noted that the focus of the questioning at the *Loudermill* hearing was not limited to the narrow issues of a conviction and notification of the arrest. *Id.* The court also pointed out that the termination letter detailed the facts and notified Moss of Chief Benson's conclusions that Moss's "'behavior was irresponsible, careless and reckless,' that he had 'brought dishonor' to the Fire Department, and that he was being terminated 'for violating the standards of personal conduct and behavior' of Fire Department employees." *Id.* It found that the termination letter "provid[ed] Mr. Moss with notice of the specific factual allegations that Chief Benson considered in deciding to terminate his employment 'for violating the standards of personal conduct and behavior of Shelby County Fire Department employees.'"[4] *Id.* at 833. Finally, the supreme court found that Moss came to the

---

[4] Although the termination letter did not specify which particular "standards of personal conduct and behavior" were violated, the supreme court included a footnote stating:

> The Fire Department's "General Rules Governing Conduct" provide that the Fire Department may impose discipline, including termination, when an employee "has been offensive in his conduct toward ... the public." These general rules of conduct also require employees to exhibit courtesy in their interactions with the public and "avoid harsh, violent, profane and insulting language and manners." Failure to comply with this

hearing before the Board prepared to challenge Chief Benson's conclusions about his conduct at the rally and his alleged dishonesty regarding the past incidents. *Id.* at 832-33. In conclusion, the court stated:

> Based on the pre-termination *Loudermill* notice, the questions during the *Loudermill* hearing, and the contents of the termination letter, we conclude that Mr. Moss had sufficient notice that his conduct during the November 2013 altercation and his answers about the 2011 and 2012 incidents were reasons for his termination. Mr. Moss received adequate notice of the factual allegations against him and had an opportunity to prepare for his hearing before the Board. His contention that the Fire Department violated his due process rights lacks merit.

*Id.* In closing, the court noted Moss's alternative arguments that "he was denied due process because he did not have a chance to confront Mr. Ezzell, who did not appear at the hearing; the Board improperly limited the scope of his cross-examination of Mr. Mayfield; and the Board denied him the chance to present evidence of disparate discipline," in addition to his contention that "the Board's decision was arbitrary and capricious and not based on substantial and material evidence." *Id.* at 833-34. The supreme court remanded to this Court for consideration of these issues. *Id.* at 834.

## II. ISSUES PRESENTED[5]

After the remand to this Court, we gave the parties the opportunity to file supplemental briefs to address the issues on remand. The Board filed a supplemental brief, but Moss did not. As a result, we will quote the issue presented in his original brief to this Court:

---

requirement constitutes "gross insubordination."

*Id.* at 827 n.5. In a separate footnote, the court further recognized:

> The Fire Department's general rules of conduct state that "[e]mployees shall not misrepresent or falsify any matter verbally or in writing" and that refusal "to give complete and accurate information shall be grounds for disciplinary actions." The rules that the Fire Department asserts Mr. Moss violated apply to on-duty and off-duty conduct.

*Id.* at 827 n.6.

[5] Prior to this Court's first decision on appeal, Moss filed a motion to consider post-judgment facts, which was denied. In his brief on appeal, he suggested that the denial of his motion was erroneous. However, he did not list any issue for review regarding his motion to consider post-judgment facts. We decline to reconsider our denial of the motion in this opinion. *See Hodge v. Craig*, 382 S.W.3d 325, 335 (Tenn. 2012) ("[A]n issue may be deemed waived when it is argued in the brief but is not designated as an issue in accordance with Tenn. R. App. P. 27(a)(4).")

Whether the court below, in affirming the decision of the Shelby County Civil Service Merit Board ("Board") to uphold the termination of Mr. Moss's employment, erred in failing to reverse the Board's decision on the basis that it violated due process, was arbitrary and/or was unsupported by substantial and material evidence pursuant to T.C.A. § 4-5-322(h)(1), (4) or (5).

We also bear in mind the specific instructions on remand from the Tennessee Supreme Court. *See Moss*, 597 S.W.3d at 833-34.

For the following reasons, we affirm the chancery court's rulings in part but ultimately vacate in part the decision upholding Moss's termination and remand for further proceedings before the Board.

## III. STANDARD OF REVIEW

Courts "review a civil service board decision upholding the termination of a civil service employee under the standards for judicial review set forth in the Tennessee Uniform Administrative Procedures Act, Tennessee Code Annotated section 4-5-322." *Moss*, 597 S.W.3d at 830 (citing *Davis v. Shelby Cnty. Sheriff's Dep't*, 278 S.W.3d 256, 263 (Tenn. 2009)). Pursuant to section 4-5-322(h), this Court

> may affirm the decision of the agency or remand the case for further proceedings. The court may reverse or modify the decision if the rights of the petitioner have been prejudiced because the administrative findings, inferences, conclusions or decisions are:
> (1) In violation of constitutional or statutory provisions;
> (2) In excess of the statutory authority of the agency;
> (3) Made upon unlawful procedure;
> (4) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion; or
> (5) (A) Unsupported by evidence that is both substantial and material in the light of the entire record.
> (B) In determining the substantiality of evidence, the court shall take into account whatever in the record fairly detracts from its weight, but the court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact.

*Id.* (quoting Tenn. Code Ann. § 4-5-322(h) (2011)).[6]   However, we "may reverse,

---

[6] When seeking review in chancery court, Moss mistakenly entitled his petition as a petition for writ of certiorari rather than a petition for judicial review. Courts have repeatedly reiterated that decisions of the

remand, or modify a civil service board decision only for errors that affect the merits of the decision." *Id.* (citing Tenn. Code Ann. § 4-5-322(i)).

## IV. DISCUSSION

### A. *The Opportunity to Confront Mr. Ezzell*

The first argument we address is whether Moss was denied due process because he did not have a chance to confront Mr. Ezzell when he did not appear at the Board hearing. Moss argues that the chancery court erred in concluding that he waived his right to confront Mr. Ezzell. However, we agree with the chancery court on this issue.

Moss quotes extensively from *Case v. Shelby County Civil Service Merit Board*, 98 S.W.3d 167, 174-75 (Tenn. Ct. App. 2002), in which this Court ultimately held that "due process mandates that a classified civil service employee whose employment may be terminated only for cause must be afforded the opportunity to confront and cross-examine the witnesses against him at the post-termination hearing where the facts giving rise to termination are in dispute or where the severity of the discipline is challenged." When applying this holding from *Case*, however, we have said "it is important to note that an employee must only be afforded 'the opportunity' to confront and cross-examine the witnesses against him." *City of Memphis v. Morris*, No. W2011-02519-COA-R3-CV, 2012 WL 4040693, at *12 (Tenn. Ct. App. Sept. 14, 2012) (citing *Kirkwood v. Shelby County Gov't*, No. W2005-00769-COA-R9-CV, 2006 WL 889184, at *8 (Tenn. Ct. App. Apr. 6, 2006)). "'[T]hat 'opportunity' is a right that may be lost or waived by the employee.'" *Id.* (quoting *Kirkwood*, 2006 WL 889184, at *8). For instance, in *Kirkwood*, this Court explained,

> Mr. Kirkwood had the opportunity to subpoena Officer Tiawana Taylor, Officer Carlos Nisby, Officer Larry Branch, and Nurse Toya Allen, those who had given testimony against him. He did not. Mr. Kirkwood's failure to capitalize on his opportunity to examine those who made accusations against him was not the result of the County's conduct, but was instead the

---

Shelby County Civil Service Merit Board are reviewed in accordance with Tennessee Code Annotated section 4-5-322. *See Davis*, 278 S.W.3d at 262 ("reiterat[ing] the applicability of the UAPA standard of review in cases involving the Shelby County Civil Service Merit Board" and explaining that "the old common law writ of certiorari review" was replaced by statutory amendment in 1989); *see also Campbell v. City of Chattanooga*, No. E2018-02010-COA-R3-CV, 2019 WL 5792884, at *3 n.3 (Tenn. Ct. App. Nov. 6, 2019) (stating that an erroneously styled petition does not preclude our review of the appeal but noting it "for the purpose of edification").

We note, however, that the Shelby County Civil Service Merit Board does not have to conduct its hearings in conformity with the contested case procedures of the UAPA, even though the Board's decision is subject to review in accordance with the UAPA's judicial review standard. *Davis*, 278 S.W.3d at 263-64.

product of his own attorney's tactical decisions. Fundamental fairness required that Mr. Kirkwood be given fair opportunity to confront his Accusers and to test the strength of the evidence against him. However, the decision to take advantage of the opportunity ultimately rested with Mr. Kirkwood, and he must bear the responsibility for waiving his opportunity to confront his accusers. Mr. Kirkwood was afforded the opportunity to examine his Accusers and was not denied his rights under Article I, § 8 of the Tennessee Constitution and the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

2006 WL 889184, at *9. The Court also clarified that there was "no obligation on the part of Shelby County to call the employee's accusers, only that Shelby County must meet its burden of going forward and establishing a prima facie case against the employee." *Id.* at *1.

In the case before us, Moss did subpoena Mr. Ezzell, but he did not appear at the hearing apparently because he was out of town. As a result, counsel for Moss asked the Board to dismiss the charges against him and end the hearing. The Board Chairman advised counsel that the Board did not have the power to do so and said, "at the most, we can continue." Moss's attorney stated, "We are not asking for a continuance. We want to proceed forward." Counsel for Shelby County said Mr. Ezzell had informed him that he had a longstanding trip planned with his wife and did not plan to reschedule. Moss's attorney responded by stating,

[Shelby County's attorney] has been honorable and we have talked about a bunch of issues in this case -- I believe after [Shelby County's attorney] told me that, he said, "What do you want to propose?" I said, "You know, give me deposition dates and I will try to work it out." And I never heard back from him.

So, the issue is this hearing has been continued a number of times. When some issues came up, we discussed things with counsel and [the Board secretary], and we just had to go forward.

Moss's attorney stated that the hearing had already been continued twice. The Board secretary confirmed that the previous two continuances were requested by Moss. The Board Chairman asked "what do we accomplish if we continue it a third time?" Moss's counsel replied, "I don't want to accomplish it. I want -- I want the Commission to understand that we are being denied the very essence of our right to confront the witness." The Chairman then announced that the Board was going to continue with the hearing.

As the transcript reflects, counsel for Moss made a tactical decision to decline to ask for a continuance, instead reiterating repeatedly that he did not want one. He failed to

- 14 -

take advantage of the opportunity to seek a continuance of the hearing to another date when he could have had the opportunity to confront Mr. Ezzell. Thus, there was no denial of due process in this case. *See, e.g.*, *Cope v. Tenn. Civ. Serv. Comm'n*, No. M2008-01229-COA-R3-CV, 2009 WL 1635140, at *5 (Tenn. Ct. App. June 10, 2009) ("To the extent Mr. Cope claims that these witnesses were essential to his defense, the record does not show that he sought a continuance or recess to secure their attendance or made an offer of proof of their anticipated testimony.").[7]

### B. Mr. Mayfield

The next issue that this Court was directed to consider on remand was Moss's alternative argument that he was denied due process because "the Board improperly limited the scope of his cross-examination of Mr. Mayfield." *See Moss*, 597 S.W.3d at 833-34. However, the precise basis for Moss's argument on this issue is difficult to determine from his original brief to this Court. As previously noted, he raised only a single broadly worded issue on appeal. Thus, his arguments in his original brief are intertwined and intermingled with his original argument about due process that has already been resolved by the Tennessee Supreme Court. Moss did not file a supplemental brief on remand to clarify the issues remaining to be decided by this Court.

Moss's original brief argued that he was denied procedural due process for several reasons, including because he was "denied the opportunity to confront witnesses against him." After discussing the aforementioned issue about the absence of Mr. Ezzell, Moss briefly made the following argument regarding Mr. Mayfield:

> The cross examination of Mr. Mayfield was limited by the Board. Moreover, for the limited extent that Mr. Moss, through counsel, was able to question Mr. Mayfield about the events of November 1, 2103 [sic], Mr. Mayfield was an equivocal witness. Rather than instructing the witness to answer questions, one member of the hearing panel openly laughed at Mr. Mayfield's behavior. *Without an impartial Board prepared to direct the witness to answer questions, Mr. Moss was unable to explore facts on*

---

[7] In a footnote in his brief on appeal, Moss suggests that there was one missing page of the transcript from the Board hearing where the issue of a continuance was briefly discussed again after the initial discussion that we have mentioned in this opinion. The footnote in his brief states that the chancery court granted an oral motion to correct the record to include the page on April 13, 2018. However, his brief (filed April 30, 2018) does not cite to anything in the appellate record to show that this occurred, and we have no transcript of any hearing that occurred in the chancery court. No supplemental record was ever filed. Moss has attached what he claims was the missing page to his brief on appeal. However, "[w]e cannot consider documents attached to briefs that are not included in the appellate record." *Vaughn v. DMC-Memphis, LLC*, No. W2019-00886-COA-R3-CV, 2021 WL 274761, at *6 n.6 (Tenn. Ct. App. Jan. 27, 2021). Considering that Moss knew the page was missing in 2018 and has taken no further action to address the issue three years later, we have proceeded to consider only the pages in the record on appeal.

*cross-examination* addressing the issue of how the argument between Mr. Ez[z]ell and Mr. Moss became a physical altercation between Mr. Mayfield, Mr. Moss and Mr. Ez[z]ell. Despite this fact, it is clear from the record is [sic] that Mr. Moss was only involved in a verbal exchange with Mr. Ez[z]ell before he was physically grabbed by Mr. Mayfield and pulled his gun in response to be [sic] grabbed and placed in a choke hold by the armed Mayfield. Tr. at page 55, line 9 - line 24; page 147, line 8 - page 148, line 8. Mr. Moss was completely denied the right to confront Mr. Ez[z]ell and to effectively cross-examine Mr. Mayfield, his accusers.

(emphasis added). Based on the sentence that we have italicized above, we construe Moss's argument regarding Mr. Mayfield to be that the Board denied him due process by failing to direct Mr. Mayfield to answer counsel's questions and laughing at his response. This characterization is consistent with the way Moss framed his argument in his petition filed in chancery court, where he argued that he was denied due process because:

> c.      During the cross examination of Mr. Mayfield, [he] became unresponsive and sarcastic. Rather than directing Mr. Mayfield to simply answer questions, the Board did nothing. In fact, a member of the Board hearing panel began laughing at Mr. Mayfield's sarcasm;

> d.      During the civil service hearing, one of the Commissioner[s] openly laughed at the proceedings illustrating his failure to properly conduct the hearing.

From our review of the transcript, however, we cannot tell that Mr. Mayfield ever declined to answer any questions or failed to answer in a responsive way. More importantly, the transcript does not show that counsel for Moss ever asked the Board to direct the witness to answer any questions. On appeal, Moss asserts that the Board should have instructed the witness to answer questions, but this issue was never brought to the Board's attention. If counsel for Moss believed that the witness was providing sarcastic or unresponsive answers, which we cannot discern from the transcript,[8] he should have asked the Board to give the instruction that he now says would have been appropriate. "Tennessee Rule of Appellate Procedure 36(a) provides that '[n]othing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error.'" *State v. Rimmer*, 623 S.W.3d 235, 288 (Tenn. 2021). Thus, we conclude that Moss is not entitled to relief with respect to his issue regarding an instruction to the witness.

_____

[8] "It is difficult to assess allegations regarding [] sarcasm. The written record rarely provides an accurate reflection of any such behavior." *State v. Knapp*, No. 02C01-9608-CR-00282, 1997 WL 759433, at *6 (Tenn. Crim. App. Dec. 10, 1997).

- 16 -

To the extent that Moss assigns error to the fact that a Board member laughed during the testimony, we likewise conclude that he is not entitled to reversal. The transcript reflects that Mr. Mayfield had already answered two questions indicating that he did not see Moss speaking with his wife at the rally. He stated, "No, I never saw him talking to his wife at any point." Immediately thereafter, he was again asked about Moss speaking to his wife, and the following exchange occurred:

> Q. Did he approach you at that point or did he go and speak to his wife?
> A. He never spoke with his wife. I think I have said that two or three times. Are you hearing impaired?
> Q. Excuse me?
> A. Are you hearing impaired? I can't figure out why --
> Q. I am not hearing impaired at all, sir.
> A. Good, good.

Moss's attorney then asked for the record to reflect that a Board member "laughed when a witness used derogatory terms towards an attorney." He asked for the name of the Board member who laughed, and the Board member identified himself and stated that he did not laugh at the term used but at counsel's questioning. Moss's counsel said he would appreciate it if the Board members would not laugh because "we take this very seriously." The Board Chairman said, "We do, too."

Pursuant to Tennessee Code Annotated section 4-5-322(i), a reviewing court may reverse, remand, or modify a civil service board decision only for errors that affect the merits of the decision. *Moss*, 597 S.W.3d at 830. Moss has not shown that such was the case here. We decline to reverse the Board's decision on account of this isolated incident. *See, e.g, Knapp*, 1997 WL 759433, at *6 ("A reference to the trial judge's laughter after one exchange was, in our view, clearly inconsequential in the entire context of the trial.") (citing Tenn. R. App. P. 36(b)).

### C. Cross-Examination of Chief Benson

The next issue to be addressed on remand was whether "the Board denied [Moss] the chance to present evidence of disparate discipline."[9] *Moss*, 597 S.W.3d at 833. This

---

[9] We note at the outset that Moss has never raised any equal protection argument arising from the alleged disparate treatment. In *Holmes v. City of Memphis Civil Service Commission*, No. W2016-00590-COA-R3-CV, 2017 WL 129113, at *7-8 (Tenn. Ct. App. Jan. 13, 2017), this Court held that a civil service commission did not commit reversible error in excluding a fireman's evidence of disparate treatment when he did not assert that his different treatment was based on membership in a suspect class, and therefore, his equal protection claim was destined to fail. Because his claim was one based on *constitutional* equal protection rights, the proffered evidence of mere disparate treatment was "not material." *Id.* As we had explained in another case, "public employees will typically have a variety of

issue arises from counsel's attempt to cross-examine Chief Benson regarding his three-factor termination policy. As previously noted, on direct examination, counsel for Shelby County had asked Chief Benson if the way that he handled Moss's situation was how he would uniformly handle similar instances, and Chief Benson responded,

> A. It's very simple. One of our rules is if there is a domestic incident and the employee is the primary aggressor, and if there is a weapon involved, that is a termination. It is a terminating offense.
> Domestic violence, primary aggressor, weapon involved of any type, termination. That is my history. That is the policy.
> Q. And the employees understand that?
> A. The employees understand that.

On cross-examination, Chief Benson clarified that this three-factor policy would apply to violence or assaults generally, not just domestic assaults. Upon further questioning by Moss's counsel, the following exchange occurred:

> Q. All right. What about if somebody commits sexual battery? Would you allow them to be a firefighter?

| [Shelby County's attorney]: | Objection. This is speculation. |
| [Moss's attorney]: | That is not speculation. |
| [Shelby County's attorney]: | Let's move on. |
| [Moss's attorney]: | It's not speculation. |
| [Shelby County's attorney]: | That is not the issue here. The issue is what his history is. |
| [Moss's attorney]: | He has uniform policies and uniform enforcement of policies. |

> A. They would likely be terminated.
> Q. Okay. Well, why wouldn't you terminate Mr. -- Mr. Andre Gaston?

| [Board Chairman]: | That is not admissible. That is not |

---

protections from just the sort of arbitrary personnel actions at issue, 'but the Equal Protection Clause is not one of them.'" *Echols v. City of Memphis*, No. W2013-00410-COA-R3-CV, 2013 WL 5230251, at *3 (Tenn. Ct. App. Sept. 16, 2013) (quoting *Engquist v. Oregon Dep't of Agriculture*, 553 U.S. 591, 609 (2008)). In *Holmes*, the employee tried to argue on appeal that his "disparate treatment argument" was based on a "violation of the City's policy requiring fair and equal treatment of its employees rather than on violation of his constitutional equal protection rights." 2017 WL 129113, at *8. We were not persuaded by that argument because his filings clearly characterized his claim as one based on equal protection. *Id.* We said there was "no basis from which we can conclude that Mr. Holmes's disparate treatment argument is based on anything other than constitutional equal protection." *Id.* Here, however, Moss has argued "disparate treatment" but never mentioned a claim for equal protection.

admissible to this hearing, whoever it is.

Q. Do you know Andre Gaston?

| | |
|---|---|
| [Shelby County's attorney]: | I am going to object to that again. He is not the subject of this hearing. The subject of this hearing is Paul Zachary Moss. |
| [Moss's attorney]: | Cross-examination involves -- he testified that he enforces law. |
| [Shelby County's attorney]: | Andre whomever you mentioned is -- |
| [Board Chairman]: | But you are the one that brought up sexual battery. |
| [Moss's attorney]: | I did. Well, I am trying to show that he -- that I am trying to impeach that statement. |
| [Board Chairman]: | Well -- |
| [Shelby County's attorney]: | With irrelevant evidence. |
| [Moss's attorney]: | It's not irrelevant. |
| [Shelby County's attorney]: | The evidence should be focused toward Paul Zachary Moss, not an unnamed individual that we are just now mentioning. |
| [Moss's attorney]: | I am sorry you don't know about it, or maybe you do. I am going to ask it or make an offer of proof. |
| [Shelby County's attorney]: | I am going to object again. |
| [Board Chairman]: | I am going to uphold the objection. |
| [Moss's attorney]: | Okay. Are you refusing to allow me to ask the question? |
| [Board Chairman]: | I upheld the County's objection. |
| [Moss's attorney]: | Okay. I would like to make an offer of proof at the appropriate time. |
| [Board Chairman]: | That would be at an appeal, I believe. |
| [Moss's attorney]: | You are refusing to consider this evidence? |
| [Board Chairman]: | Again, by my upholding the County's objection, you can call it a refusal -- |
| [Moss's attorney]: | Okay. All right. |
| [Board Chairman]: | -- but it's not the language I am using. |

Based on this exchange, Moss argues that he was not afforded "the ability to offer evidence of a lack of uniformity of discipline."  He claims that he intended to show that

- 19 -

other employees who were similarly situated "received less harsh discipline." Moss relies on this Court's decision in *City of Memphis v. Cattron*, No. W2010-01659-COA-R3-CV, 2011 WL 1902167, at *1 (Tenn. Ct. App. May 13, 2011), in which this Court affirmed the conclusion of the City of Memphis Civil Service Commission that the City lacked a reasonable basis for terminating an employee after considering the fact that disparate discipline was meted out to other dispatchers. *Id.* at *6. Specifically, the deputy chief had been questioned about two other cases in which dispatchers were charged with neglect of duty and received less harsh discipline. *Id.* at *2. Based on *Cattron*, Moss argues that the Board's decision to deny him the opportunity to present the same type of evidence of disparate discipline was not only a violation of due process but also "made upon an unlawful procedure, arbitrary and capricious, and not supported by substantial evidence in violation of T.C.A. §4-5-322(h)."

In response, the Board acknowledges that evidence of disparate treatment was considered in *Cattron*, but the Board insists that it has no obligation to consider such evidence in employee termination cases. The Board claims that it had the "prerogative" to determine that Moss's proffered evidence was not probative. The Board acknowledges that its written "Hearing Procedures" provide, "Both parties may examine and cross-examine witnesses." However, the Board claims that the term "cross-examine" is not a defined term and that its procedure during Moss's hearing was permissible and consistent with Tennessee Rule of Evidence 611(c)(2). We consider this latter argument first, as the chancery court agreed with the Board on both of these issues.

We begin with an observation about the Rules of Evidence in proceedings before the Shelby County Civil Service Merit Board. As our supreme court explained in *Davis v. Shelby County Sheriff's Department*, 278 S.W.3d at 266:

> Strict adherence to the Tennessee Rules of Evidence [] is not required in proceedings before the Board. By their own terms, the Tennessee Rules of Evidence do not apply to administrative hearings, but rather to court appearances. Tenn. R. Evid. 101 ("These rules shall govern evidence rulings in all trial courts of Tennessee except as otherwise provided by statute or rules of the Supreme Court of Tennessee."). Therefore, the Tennessee Rules of Evidence do not apply unless the Board enacted a rule to adopt them. *See Goodwin v. Metro. Bd. of Health*, 656 S.W.2d 383, 388 (Tenn. Ct. App. 1983) ("[N]either the technicalities of the Civil Rules of Procedure nor the common law rules of evidence necessarily apply before nonjudicial bodies unless the rules of that body so require.") (emphasis added) (citing *Big Fork Mining Co. v. Tenn. Water Quality Control Bd.*, 620 S.W.2d 515 (Tenn. Ct. App. 1981); *L & N Railroad Co. v. Fowler*, 197 Tenn. 266, 271 S.W.2d 188 (1954)). In this instance, the Civil Service Merit Act does not provide that Board hearings are subject to the Tennessee Rules of Evidence. 1971 Tenn. Priv. Acts, ch. 110, § 23. Accordingly, in

reviewing decisions from these "less than legally formal hearings," appellate courts are guided, not by the Rules of Evidence, but instead "by a sense of fair play and the avoidance of undue prejudice to either side of the controversy and [must determine] whether ... the action of the hearing Board in admitting or excluding evidence was unreasonable or arbitrary." *Goodwin*, 656 S.W.2d at 388.

The Board acknowledges that the Rules of Evidence are not mandatory in its proceedings but argues that it was nonetheless free to apply the "evidentiary principle" set forth in Rule 611(c)(2) and that its decision to do so cannot constitute a violation of due process.

The Board has simply misconstrued Rule 611. The Rule provides:

**(a) Control by Court.** The court shall exercise appropriate control over the presentation of evidence and conduct of the trial when necessary to avoid abuse by counsel.

**(b) Scope of Cross-Examination.** *A witness may be cross-examined on any matter relevant to any issue in the case*, including credibility, *except* as provided in paragraph (c)(2) of this rule.

**(c) Leading Questions.**
(1) Leading questions should not be used on direct examination of a witness except as may be necessary to develop the witness's testimony. Leading questions should be permitted on cross-examination.
(2) *When a party calls a hostile witness, an adverse party . . . , or a witness identified with an adverse party*, interrogation may be by leading questions. *The scope of cross-examination under this paragraph shall be limited* to the subject matter of direct examination, and cross-examination may be by leading questions.

Tenn. R. Evid. 611 (emphasis added). According to the Advisory Commission Comment, subsection (b) "retains the English rule permitting wide-open scope of cross-examination historically favored in Tennessee." Tenn. R. Evid. 611 cmt. Subsection (c)(2) then provides an exception to the general rule. *See* Tenn. R. Evid. 611(b) ("except as provided in paragraph (c)(2) of this rule"); *State v. Huskey*, No. E1999-00438-CCA-R3-CD, 2002 WL 1400059, at *178 (Tenn. Crim. App. June 28, 2002) (explaining that "in Tennessee, cross-examination is not limited to matters discussed during direct examination" but noting Rule 611's "exception for adverse parties in civil cases").

Professor Neil Cohen and his colleagues provide a helpful explanation of the rule in *Tennessee Law of Evidence*:

Although Rule 611(b) follows the traditional Tennessee wide-open approach to the scope of cross-examination, there are still many limits on the subjects that can be raised during cross-examination. . . .

Rule 611(c)(2) places another limit on cross-examination in the unusual civil case where a party calls the adverse party as a witness. Since this witness is, by definition, a hostile witness, Rule 611(c)(2) permits direct examination by leading questions. *In this situation cross-examination is by friendly counsel (i.e. the lawyer representing the witness).* This presents the possibility that cross-examination, done by "friendly" leading questions, could be used to present evidence on new issues. The new issues would only be developed by leading questions since both sides are permitted to use leading questions in this unusual situation. To avoid this possibility and minimize the number of issues proven only by leading questions, Rule 611(c)(2) limits cross-examination in such cases to the subject matter of direct examination. Under this rule, the same limitation applies to cross-examination of a witness identified with an adverse party, as well as a hostile witness.

Neil P. Cohen et al., *Tennessee Law of Evidence*, § 6.11[5][b] (6th ed. 2011) (emphasis added) (footnote omitted).

On appeal, the Board claims that it "applied the same process found in Rule 611(c)(2) . . . allowing leading questions to a hostile witness, but limiting the scope of cross examination to those matters covered on direct examination." The problem with this argument is that Rule 611(c)(2) only applies "in the unusual civil case where a party calls the adverse party as a witness." *See id.* Here, the Board attempted to apply the exception in Rule 611(c)(2) to limit Moss in his cross-examination of the witnesses called by Shelby County. Soon after Moss's counsel began to cross-examine the first witness called by Shelby County, the Board Chairman interrupted and stated,

I just want to remind everybody before we proceed of two things. Number one, cross examination has the boundaries of only asking the witness questions regarding his previous testimony. That is number one. . . .

He directed counsel to "keep the cross-examination to the questions that were asked." When counsel for Moss insisted that "[c]ross is not limited," the Chairman said "you can ask [the witness] questions about his testimony."

In summary, even if the Tennessee Rules of Evidence were being applied, the limited exception of Rule 611(c)(2) would not have applied to limit Moss in his cross-examination of Chief Benson when he was a witness called by Shelby County. Thus, we reject the Board's initial argument that the Chairman was justified in limiting cross-examination because he was applying "a longstanding rule of Tennessee's trial courts"

found in Rule 611(c)(2).

From our review of the transcript, the objection by counsel for Shelby County was to the relevance of the evidence regarding the other firefighter who may have committed sexual battery. Counsel for Moss insisted that the evidence was relevant because he was attempting to cross-examine Chief Benson about his statement that he uniformly enforces his three-factor policy and impeach his testimony on that issue. Shelby County argued that the "evidence should be focused toward Paul Zachary Moss" and not another individual. The Board Chairman stated that he was upholding the objection of Shelby County.

Aside from *Cattron*, this Court has considered several other cases where evidence of disparate treatment was admitted in civil service hearings in an effort to show that an employee should not have been terminated.[10] *See, e.g.*, *Cooper v. City of Memphis Civ. Serv. Comm'n*, No. W2018-01112-COA-R3-CV, 2019 WL 3774086, at *5 (Tenn. Ct. App. Aug. 12, 2019) (considering an argument that a firefighter's termination was arbitrary because five other firefighters who violated the policy were not terminated but ultimately finding those cases were not sufficiently comparable); *City of Memphis v. Civ. Serv. Comm'n of City of Memphis*, No. W2006-01258-COA-R3-CV, 2007 WL 1227465, at *7 (Tenn. Ct. App. Apr. 25, 2007) (considering a police officer's argument that another officer had only been suspended following a particular incident and that this showed "disparate treatment" but ultimately concluding that the other incident was clearly distinguishable); *Lamarr v. City of Memphis*, No. W2002-02087-COA-R3-CV, 2004 WL 370298, at *1-3 (Tenn. Ct. App. Feb. 27, 2004) (noting an officer's argument that he was treated differently than other officers who had been involved in alcohol-related accidents and received suspensions or fines rather than being terminated but concluding that a new zero tolerance policy had been communicated since those incidents); *but see Freeman v.*

---

[10] We reject the Board's suggestion that the "most instructive case" on this issue is *Massey v. Shelby County Retirement Board*, 813 S.W.2d 462, 465 (Tenn. Ct. App. 1991), where this Court stated that "'arbitrary, illegal, and/or capricious' refers to the Board's handling of the specific case before it, not how the Board handled this case as compared to some other case." *Massey* is procedurally distinguishable. After a county retirement board denied the employee disability benefits, the chancery court reviewed the decision pursuant to the common law writ of certiorari, and the employee attempted, *at that stage* of the proceeding, "to present to the chancellor 'additional evidence' consisting of personnel and medical records of other employees" to show that he was treated differently and therefore *the retirement board* had acted arbitrarily. *Id.* at 463-64. We explained, "[w]hat plaintiff, in essence, was trying to establish by the 'additional evidence' goes to the sufficiency of the evidence," and whether there was material evidence to support the action of the agency was a question "to be decided by the reviewing court upon an examination of the evidence introduced before the agency." *Id.* at 465. Because the "issue before the court [was] the sufficiency of the evidence to support an administrative fact-finding," "no new evidence [was] admissible" and the "reviewing court [was] confined to the record as it existed before the lower fact-finding tribunal." *Id.* Moss's case does not involve an attempt to present evidence of disparate treatment to a chancellor to show "how the Board handled this case as compared to some other case." *See id.* He attempted to present evidence directly to the Board itself.

*City of Chattanooga*, No. E2010-01286-COA-R3-CV, 2011 WL 1197676, at \*4 (Tenn. Ct. App. Mar. 31, 2011*)* (noting a petitioner's argument that the city council "somehow violated its own policy in the conduct of the hearing" by sustaining an objection to questions regarding other officers but concluding that he "has not actually shown an irregularity in the conduct of the hearing").

Here, the Board's Hearing Procedures state, "Both parties may examine and cross-examine witnesses. Both parties may object to clearly irrelevant material, but technical objections as used in a court of law will not be entertained." (rule numbering omitted). Although evidentiary rules "are relaxed in administrative hearings in comparison to judicial proceedings, even in administrative hearings, there must be some relevancy to the issue before the administrative body." *Hayes v. Metro. Gov't of Nashville & Davidson Cty.*, No. 01-A-019108-CH-00291, 1992 WL 40194, at \*5 (Tenn. Ct. App. Mar. 4, 1992). Returning to the Tennessee Supreme Court's language from *Davis*, we also reiterate that

> in reviewing decisions from these "less than legally formal hearings," appellate courts are guided, not by the Rules of Evidence, but instead "by a sense of fair play and the avoidance of undue prejudice to either side of the controversy and [must determine] whether ... the action of the hearing Board in admitting or excluding evidence was unreasonable or arbitrary." *Goodwin*, 656 S.W.2d at 388.

278 S.W.3d at 266. The issue, then, as we perceive it, is whether the Board's decision to exclude evidence of disparate treatment was "unreasonable or arbitrary." *See id.*[11]

We conclude that the Board's conclusion was arbitrary and unreasonable. Chief Benson repeatedly emphasized that it is his policy to terminate any employee who is involved in a violent incident or assault when the employee is the primary aggressor and a weapon is involved. He said the employees understand this policy and that it is uniformly applied. Thus, on cross-examination, he said that an employee who committed sexual battery would "likely" be terminated under this policy. However, when counsel for Moss attempted to ask why one particular employee had not been terminated under this uniformly enforced policy, the Board ruled that the evidence was irrelevant and inadmissible. We conclude that Moss's proffered evidence of disparate treatment was not "clearly irrelevant" when counsel's stated purpose was impeaching the testimony of Chief Benson about his uniform application of his three-factor termination policy.

---

[11] Under Tennessee Code Annotated section 4-5-322(h)(4), "'[a]n arbitrary or capricious decision is one that is not based on any course of reasoning or exercise of judgment, or one that disregards the facts or circumstances of the case without some basis that would lead a reasonable person to reach the same conclusion.'" *Miller v. Civ. Serv. Comm'n of Metro. Gov't of Nashville & Davidson Cty.*, 271 S.W.3d 659, 665 (Tenn. Ct. App. 2008) (quoting *City of Memphis v. Civil Serv. Comm'n*, 216 S.W.3d 311, 316 (Tenn. 2007)).

We deem it appropriate to remand this matter to the Board for consideration of evidence of disparate treatment. We note that during the original Board hearing, Moss's counsel only mentioned one specific employee during his cross-examination before the objection by Shelby County. On appeal, he argued in his brief that he was "denied an opportunity to present evidence that other civil servants similarly situated as he had been disciplined but had received less harsh discipline." During oral argument before this Court, counsel represented that he had a "whole stack" of evidence about employees that he was not permitted to explore on cross-examination. The transcript indicates that Moss's counsel attempted to make an offer of proof during the original Board hearing but that he was not permitted to do so. As a result, we do not know the precise extent of the evidence that Moss intended to introduce. In light of these circumstances, we conclude that on remand, the scope of evidence of disparate discipline should not be limited to the one employee specifically mentioned during the original Board hearing.[12]

We recognize that the chancery court alternatively decided that the exclusion of Moss's evidence of disparate treatment was harmless error because "the conduct of Chief Benson in unwritten policies was not the matter before the [Board]." We disagree. The Board was to "commence a hearing," "fully hear and determine the matter," and "either affirm, modify, or revoke [the] order of discipline." *Davis*, 278 S.W.3d at 266 n.21 (quoting 1971 Tenn. Priv. Acts, ch. 110, § 23). The Board's written decision upholding termination specifically noted Chief Benson's testimony "that termination is warranted when three things are involved: 1) Domestic violence or assault, 2) the employee is the primary aggressor, and 3) a weapon in involved." If the Board had considered the evidence of disparate treatment, it might have determined that termination of Moss was not reasonable or warranted, just as the civil service commission did in *Cattron*. *See Cattron*, 2011 WL 1902167, at *3 ("[T]he Commission concludes that the City's termination of Mr. Cattron's employment was not reasonable under the circumstances, considering the City's policy of progressive discipline and the City's lesser discipline imposed upon other dispatchers for similar violations[.]"). Considering the lack of an offer of proof, we cannot say, at this stage, that the exclusion of the evidence was harmless error.

## D.    *Substantial and Material Evidence*

We must note that Moss also raised an argument in his original brief on appeal regarding whether there was substantial and material evidence to support the Board's decision, and the Tennessee Supreme Court directed this Court to consider that issue on remand. However, most of Moss's argument from his original brief regarding substantial

---

[12] Because we conclude that the Board's refusal to consider evidence of disparate discipline was arbitrary and unreasonable under the standard of review set forth in *Davis* and Tennessee Code Annotated section 4-5-322(h)(4), we do not reach Moss's alternative argument that the Board's action deprived him of due process.

and material evidence was premised on his argument that he was only subject to discipline regarding the two policies listed in the *Loudermill* notice. For example, the section of Moss's brief on substantial and material evidence contains the following heading: "Mr. Moss's termination is not based on substantial material evidence, rather it is based on evidence of facts which were not identified in the *Loudermill* notice." Likewise, the Tennessee Supreme Court summarized Moss's argument that "the Board's decision was unsupported by substantial and material evidence because the evidence presented at the *Loudermill* hearing did not establish the two charges specified in the *Loudermill* notice." *Moss*, 597 S.W.3d at 829. The Tennessee Supreme Court has already rejected Moss's due process argument regarding notice. Because he did not file a supplemental brief on remand, it is difficult to determine what remains of his argument regarding substantial and material evidence. We note that during oral argument before this Court, counsel for Moss summarized the issues on remand and only mentioned the three issues that we have previously discussed in this opinion with no mention of a remaining issue regarding substantial and material evidence.

As it is, Moss's original brief on appeal primarily argues that there was no substantial and material evidence to support the Board's decision because the evidence did not establish the two charges listed in the *Loudermill* notice - that he was convicted of a felony or failed to provide notification of his arrest. However, as the Tennessee Supreme Court recognized in its opinion, Moss's termination was based on other reasons:

> The termination letter fully explained the reasons for Mr. Moss's termination . . . . The termination letter first asserted that Mr. Moss's "irresponsible, careless and reckless" behavior during the November 2013 altercation and his dishonesty during the *Loudermill* hearing violated the Fire Department's standards of personal conduct. The assertions were then supported with multiple specific examples, providing Mr. Moss with notice of the specific factual allegations that Chief Benson considered in deciding to terminate his employment "for violating the standards of personal conduct and behavior of Shelby County Fire Department employees."

*Moss*, 597 S.W.3d at 833. Moss's original argument on this issue does not appreciate the fact that his termination was actually for "violating the standards of personal conduct and behavior of Shelby County Fire Department employees." *See id.*

Moss's brief did recognize that his termination was "based on charges and events that are not contained in the *Loudermill* notice" as it related to the two prior incidents involving police. He acknowledged that his answers about these incidents were used to determine that he was untruthful. Again, however, his arguments with respect to these issues appear to be based on a lack of notice. For instance, he argued that his two prior incidents involving police were "improperly used" because "Moss was not provided any notice that the 2011 and 2012 events were the basis of the proposed discipline against

him." He argued, "If the County wanted to terminate Mr. Moss for these acts, he should have been charged with them specifically, and in a timely manner." According to our supreme court's decision, however, Moss received sufficient notice that his answers about the 2011 and 2012 incidents were one of the reasons for his termination. *Moss*, 597 S.W.3d at 833. It found:

> Mr. Moss [] came to the hearing prepared to dispute his alleged dishonesty with respect to past incidents involving alcohol, weapons, or assaults. Mr. Moss testified at length about his 2011 arrest on charges of public intoxication and possession of a firearm while under the influence of alcohol, offering the Board an alternative explanation to what the police report reflected. As for the 2012 domestic violence incident, Mr. Moss told the Board that he was not present when the police showed up and was unaware the police had taken a report. Also, Mr. Moss's counsel questioned Chief Benson about his knowledge of the 2011 and 2012 incidents, emphasizing that Chief Benson was not with the Fire Department at the time.

*Id.* Thus, the supreme court found that "the actions of Mr. Moss and his counsel at the hearing before the Board conflict with the claim that Mr. Moss did not know about the allegations against him." *Id.* "Based on the pre-termination *Loudermill* notice, the questions during the *Loudermill* hearing, and the contents of the termination letter," the court concluded that "Mr. Moss had sufficient notice that his conduct during the November 2013 altercation *and his answers about the 2011 and 2012 incidents* were reasons for his termination." *Id.* (emphasis added). In conclusion, Moss's original argument regarding substantial and material evidence does not entitle him to relief in this appeal.

## V. CONCLUSION

For the aforementioned reasons, the decision of the chancery court is affirmed in part and vacated in part. This matter is remanded to the trial court for entry of an order remanding the case to the Board for further proceedings consistent with this opinion. Costs of this appeal are taxed equally to the appellant, Paul Zachary Moss, and to the appellee, Shelby County Civil Service Merit Board, for which execution may issue if necessary.

_____
CARMA DENNIS MCGEE, JUDGE